**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **NORTEK MEDICAL STAFFING, INC.** | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| **V.** | § | |
| | § | |
| | § | **CIVIL ACTION NO. 4:24-CV-03354** |
| **JELLICO REGIONAL HOSPITAL, LLC,** | § | |
| **MISSION HEALTH PARTNERS, LLC** | § | |
| **MISSION RURAL PARTNERS, LLC** | § | |
| **PROGRESSIVE HEALTHCARE** | § | |
| **SOLUTIONS, LLC** | § | |
| *Defendants.* | § | |

**DEFENDANT'S CROSS-CLAIM AGAINST PROGRESSIVE HEALTH GROUP, LLC AND THIRD-PARTY COMPLAINT AGAINST PROGRESSIVE HEALTH OF JELLICO, LLC AND ROBERT QUENTIN WHITWELL**

TO THE HONORABLE JUDGE DAVID HITTNER:

COMES NOW, Defendant, Jellico Regional Hospital, LLC ("JRH") and brings this its combined Cross-Claim against Progressive Health Group, LLC under Rule 13(g) and Third-Party Complaint against Progressive Health of Jellico, LLC and Robert Quentin Whitwell, pursuant to Rule 14(a)(1) of the Federal Rules of Civil Procedure.

Defendants/Third-Party Plaintiff, JRH, would show the Court as follows:

**THE PARTIES**

1.      Defendant/Third-Party Plaintiff, Jellico Regional Hospital, LLC, ("JRH"), is a Texas limited liability company, the Members of which are Boa Vida Healthcare, LLC and KJ Singh, M.D., P.C. which is a professional corporation whose sole member is an individual whose citizenship is in the state of Indiana.  The Members of Boa Vida Healthcare, LLC are Singh Investments, LLC and Singh Holdings, LLC, the Members of which are individuals who are residents and citizens of the state of Indiana.

PD.49279354.1

EXHIBIT
**A**

2.    Defendant, PHG, has already entered an appearance in the case and may be served through its counsel, Gerald Waltman, III, and Adam J. Russ with GORDON, ARATA, MONTGOMERY, BARNETT, MCCOLLUM, DUPLANTIS & EAGAN, LLC, 201 Saint Charles Ave., 40th Floor, New Orleans, LA 70170-4000.

3.    Third-Party Defendant Progressive Health of Jellico, LLC ("PHJ") is a Tennessee limited liability company duly organized with its principal place of business located at 625 Bakers Bridge Avenue, Suite 105, Franklin, Tennessee 37067. Robert Quentin Whitwell is the sole member of the PHJ, LLC and is an individual who is a citizen of the State of Mississippi.  PHJ may be served by serving its registered agent, Michele Lee Sexton, 625 Bakers Bridge Avenue, Suite 105, Franklin, TN  37067 or wherever she may be found.

4.    Third-Party Defendant Robert Quentin Whitwell is the President and sole member of PHG and is a citizen of Mississippi. Third-Party Defendant Whitwell may be served at 628 N. 14th Street, Oxford, MS 38655 or wherever he may be found.

## JURISDICTION AND VENUE

5.    This Court has subject matter and jurisdiction over this matter pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds the sum of or value of $75,000.00, exclusive of interest and costs, and disputes are between citizens of different states.

6.    Venue is proper in this district under 28 U.S.C. §1391(b) because a part of the events or omissions giving rise to the claims occurred within this district. The Court has subject matter jurisdiction over PHG, PHJ, and Whitwell because PHG assumed JRH's contract with Nortek that is the basis of Plaintiff's lawsuit.  Further, PHJ took over operations of the Jellico Regional Hospital including processing Nortek's invoices for staffing services and paid two of them. Whitwell signed the contract that contained the assignment on behalf of PHG but is liable in his

individual capacity because the corporate veil should be pierced on the basis of the fraud committed as explained below.

## FACTUAL BACKGROUND

7.      Jellico Regional Hospital, LLC ("JRH") was formed in 2020 upon receiving a lease from the City of Jellico to operate the Jellico Regional Hospital located at 188 Hospital Ln., Jellico, TN 37762.  The prior lessee and operator of the hospital had stopped operations before JRH acquired the lease from the City of Jellico.

8.      Since the hospital had been idle, the Tennessee State Board of Health required JRH to make certain improvements to the building to meet current hospital code requirements. This process was exacerbated by the supply chain issues experienced during the COVID pandemic.

9.      Additionally, JRH secured partial grant funding from government sources which required a specific bid process which added to delays in re-opening the hospital.

10.      Eventually, JRH secured a loan from Pathways Lending of approximately $1.5 million to finance the upgrades to the hospital.

11.      JRH submitted the original 855A application for Critical Access Hospital ("CAH") status with the Centers for Medicare & Medicaid Services ("CMS") in 2021 and confirmed that the facility met federal requirements for CAH status.

12.      Finally, the hospital received state licensure to operate in 2023; however, CMS required twenty (20) patients to be admitted prior to survey to complete the certification of the facility as a CAH which was achieved in the summer of 2023.

13.      In October 2023, Palmetto, the Medicare Administrative Contractor, informed JRH that it would not perform an interim settlement of the Medicare Cost Report ("MCR"), and funding would not be available until the annual MCR was filed and settled in June 2024. At this point, JRH

had incurred approximately $15 million in operating costs and was not receiving cooperation from the local medical community.

14.     At this time, the JRH investors decided that further investment in JRH was not desirable and so the investors began to pursue an outside buyer.

15.     In November 2023, after moving from a full-time Emergency Room ("ER") provider to an on-call ER provider, several complaints were made to the Tennessee State Healthcare Facilities Commission which caused JRH to be placed on immediate jeopardy by the state and CMS.

16.     JRH then entered several plans of corrections over the subsequent months to bring the facility back into full compliance. These citations revolved around the staffing of the ER with providers and nurses, and some minor credentialing issues.

17.     JRH created a box.com folder with pertinent initial information and contacted many local investors including CHS in Nashville, owners of LaFollette Hospital, Baptist Corbin, Adventist Hospitals, Pikeville Hospital, KY, and other local investor groups. Progressive Health Group, LLC a Mississippi limited liability company ("PHG") led by Quentin Whitwell, Michele Sexton, and Dr. Mark Spivey emerged as the most interested group.

18.     Third-Party Defendant Whitwell signed a non-disclosure agreement ("NDA") on behalf of PHG on December 8, 2023, and was given access to the box folder with financial information, licensing, and other disclosures.

19.     Whitwell, Sexton, and Spivey visited the Jellico Regional Hospital for the first time after signing the NDA in December 2023.

20.     On Dec 19, 2023, Dr. Kirnjot Singh, on behalf of JRH, sent Whitwell a draft of an Asset Purchase Agreement ("APA"), which included an assumption of accounts payable with a cap of liability at $450,000.00, and draft bill of sale via email. He uploaded the assumed contract

list to the box.com, and other due diligence items including license issues, state survey results, etc. (*See* Exhibit 1 without the attachment for the sake of brevity).

21.     PHG submitted an 855A application to CMS dated January 25, 2024 (4 days before closing) and signed the 855A application in April 2024, representing PHG was 100% owned by Quentin Whitwell. Therefore, Whitwell was the sole member of PHG during the negotiations and signing of the APA.

22.     On December 22, 2023, after negotiating the terms of the APA, Third-Party Defendant Whitwell signed the APA which required the assignment of the hospital lease to PHG, assumption of the Pathways Lending loan (and personal guarantee), and assumption of the Accounts Payable up to a maximum of $450,000.00.

23.     The APA states as follows:

> 1.3     Assumption of Liabilities. Purchaser shall not assume any liabilities occurring before the Closing Date except as listed in this Section 1.3:
>
> (a)     Pathways loan estimated to be One Million Four Hundred Twenty-Five Thousand Six Hundred Fifteen Dollars ($1,425,615.00) ("Pathways Loan"). Purchaser shall use commercially reasonable efforts to replace the personal guarantee for the Pathway Loan of Kirnjot Singh, MD with a corporate guarantor or Quentin Whitwell as approved by the lender; however, Purchaser cannot guarantee that Kirnjot Singh, MD will be released from said guarantee. Commercially reasonable efforts will be used by Purchaser as Seller has represented that the Pathway Loan proceeds were for the benefit and improvement of the Hospital and for no other purpose(s).

Under the plain language of Section 1.3(a), Third-Party Defendant Whitwell would be replacing the personal guarantee for the loan in his personal capacity if a corporate guarantee could not be provided. (*See* Exhibit 1, p. 3, Section 1.3(a)).

24.     After signing the APA, Whitwell, Sexton, and Spivey made two appearances at Jellico City Council meetings in Jellico to advocate for assignment of the lease.

25.     Whitwell, Sexton, and Spivey were aware that the lease could be considered void if a Rural ER Hospital ("REH") were opened in the facility instead of a CAH.

26.     After not receiving the votes needed and the delays of the Jellico City Council, Defendant/Third-Party Plaintiff JRH agreed to a sublease of the hospital lease. A Sublease Agreement was executed on January 29, 2024, which allowed Third-Party Defendant PHJ to operate the premises and pay JRH the required rent. (*See* Exhibit 2.)

27.     PHJ was organized on January 23, 2024, which was six days before the closing on the sale of the hospital.

28.     The Sublease Agreement provides as follows:

"WHEREAS, Sublessor [JRH] and Progressive Health Group, LLC ("PHG") have entered into that certain Asset Purchase Agreement, dated as of December 22, 2023 (the "APA"), pursuant to which PHG will purchase substantially all of the assets of Sublessor used or held for use, *inter alia,* in the operation of the medical services located at the premises:

WHEREAS, PHG has assigned its interest in the APA to Sublessee [PHJ], and Sublessor has accepted such assignment."

(*See* Exhibit 2, p. 1) (bracketed additions for clarity).

29.     Third-Party Defendant Whitwell signed the Sublease Agreement as the CEO and the sole member of PHJ. (*See* Exhibit 2, pg. 4).

30.      Closing was completed on January 29, 2024, with Whitwell's execution of the "Bring Down Certificate."  Despite being titled as a Bring Down Certificate for ***PHG***, ***PHJ*** represented that it had fulfilled all promises in the APA agreement. Specifically, Whitwell purportedly on behalf of PHJ made the following statement:

Buyer [PHJ] hereby certifies that each covenant and agreement of Buyer to be performed prior to or as of the Closing pursuant to the Purchase Agreement has been performed, and each representation and warranty of Buyer made in Article V of the Purchase Agreement is true and correct on the Closing Date, as if and as made on and as of the Closing.

(*See* Exhibit 3) (bracket added for clarity).

PD.49279354.1

31.     Accompanying the Bring Down Certificate, Whitwell also signed a "Joint Written Consent of the Member and Manager of Progressive Health of Jellico, LLC" reflecting that he had authority to finalize these transactions and approve these statements.  *Id.*

32.     In late February 2024, the City Council of Jellico voted to approve the assignment of JRH's lease to PHJ with permission to open a REH. However, neither PHG nor PHJ took over JRH's lease or executed their own lease with the City of Jellico.

33.     Upon information and belief, Michele Sexton walked out of the Jellico Regional Hospital on March 5, 2024, and the hospital was officially closed on March 9, 2024.

### CLAIMS AND CAUSES OF ACTION AGAINST CROSS-CLAIMANT PHG AND THIRD-PARTY DEFENDANTS, PHJ AND WHITWELL

### I.     BREACH OF CONTRACT

34.     Third-Party Plaintiff JRH and Cross-Defendant PHG and Third-Party Defendant Whitwell executed a valid and enforceable contract pursuant to the offer and acceptance as described in the APA executed on December 22, 2023.  JRH and PHJ executed a valid and enforceable Sublease on January 29, 2024.  JRH relied in good faith upon the APA and Sublease to sell its assets and assign its contracts to Cross-Defendant PHG.  JRH relied in good faith upon PHJ's execution of the Sublease as PHJ's agreement to operate the facility and make the rent payments on that contract, as well.

35.     Pursuant to the APA, PHG and Whitwell were required to use commercially reasonable efforts to replace the personal guarantee for the Pathway Loan of Kirnjot Singh, M.D. with a corporate guarantor or himself as approved by the lender which Whitwell failed to do thereby breaching the APA. (*See* Exhibit 1, p. 3, Section 1.3(a)).

36.     PHJ attempted to assign the APA from PHG to PHJ in the Sublease. However, PHG and Whitwell were never actually substituted or assigned in the agreement because PHG,

Whitwell, PHJ, and JRH did not show clear and definite intent that the rights and duties of PHG and Whitwell be replaced by PHJ. PHG also never executed the Sublease agreement, and therefore, PHG's intent cannot be determined from the Sublease.

37.    Further, the language of the Sublease is internally inconsistent.  The Sublease states in the Recitals that the APA was "assigned," whereas Section 13 states that the Sublessee shall be the "substituted" party to the APA and therefor, the language of the Sublease is ambiguous and not clear.

38.    Pleading further and in the alternative, as parties to the APA, Third-Party Defendants PHG and Whitwell were not relieved of their obligations under the APA in the case of a permitted assignment.  Any obligations of Purchaser under the APA also apply to the assignee, Third-Party Defendant PHJ. The APA expressly states in Section 12.8:

> No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the Parties hereto of any of their obligations. Upon any such permitted assignment the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

(*See* Exhibit 1, p. 18.)

Therefore, regardless of whether there was an attempted assignment, PHG and Whitwell are liable for the obligations under the APA.

39.    Further, the APA states that it cannot be modified except by written agreement by all of the parties.  Specifically, Section 12.4 of the APA, Entire Agreement; Amendments and Waivers, states in pertinent part:

> This Agreement (including the schedules and exhibits hereto) and the Confidentiality Agreement represent the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

(*See* Exhibit 1, pp. 16-17.)

40.     PHG and Whitwell breached the APA contract with JRH by failing to purchase the assets of JRH as agreed upon pursuant to the APA contract and lease assignment upon which the JRH relied in good faith to its detriment.  JRH has suffered damages as described below.

41.     By executing the Bring Down Certificate, PHJ represented and warranted that all the promises of the APA had been satisfied as of that day, so that the parties could close on the sale of the hospital. JRH has since learned that most of the promises made had not been fulfilled. Thus, PHJ is also in breach of contract for breach of its representation and warranty that promises and obligations in the APA had been satisfied or would be satisfied as if done that day.

42.     By executing the Bring Down Certificate, PHJ represented that it had assumed the contracts listed, that it (or PHG) had made commercially reasonable efforts to replace the personal guarantee for the Pathway Loan of Kirnjot Singh, MD with a corporate guarantor or Quentin Whitwell as approved by the lender, and that it had paid or would pay the accounts payable up to $450,000.

43.     JRH relied upon PHJ's representations and warrants in the Bring Down Certificate, to its detriment and now JRH has incurred the damages as set forth below.  These actions constitute a separate cause of action for breach of contract.

## II.     CONTRACTUAL INDEMNITY

44.     JRH incorporates the above paragraphs as if set forth in full here.

45.     PHG and Whitwell agreed to indemnify JRH and its affiliates from any losses, liabilities, damages, and expenses incurred as a result of any misrepresentation, any breach by PHG to perform any covenant under the APA, any claim made by a third-party with respect to the operation of the hospital.  Specifically, Section 11.1 of the APA reflects as follows:

11.1 <u>Indemnification by Purchaser.</u> Purchaser shall defend, indemnify and hold harmless Seller and its affiliates, and its and their respective officers, employees, agents or independent contractors (collectively, "<u>Seller Indemnified Parties</u>"), from and against any and all losses, liabilities, damages, costs (including, without limitation, court costs and costs of appeal) and expenses (including, without limitation, reasonable attorneys' fees and fees of expert consultants and witnesses) that such Seller Indemnified Party incurs as a result of, or with respect to (i) any misrepresentation or breach of warranty by Purchaser under this Agreement, (ii) any breach by Purchaser of, or failure by Purchaser to perform, any covenant or agreement of, or required to be performed by, Purchaser under this Agreement, or (iii) any claim made by a third party with respect to the operation of the Hospital by Purchaser and the Hospital on and following the Closing Date.

(*See* Exhibit 1, p. 16.)

46.     Further, PHJ also agreed to contractually indemnify JRH in the Sublease agreement which specifically provides as follows:

**7. <u>Indemnification by Sublessee</u>**. Sublessee shall defend, indemnify and hold harmless Sublessor and its affiliates, and its and their respective officers, employees, agents, or independent contractors (collectively, "<u>Sublessor Indemnified Parties</u>"), from and against any and all losses, liabilities, damages, costs (including, without limitation, court costs and costs of appeal) and expenses (including, without limitation, reasonable attorneys' fees and fees of expert consultants and witnesses) that such Sublessor Indemnified Party incurs as a result of, or with respect to i) entering into this Agreement brought by any party including the Lessor, or ii) Sublessee's use of the Premises and fulfillment of the duties and responsibilities under the Lease while Sublessee is providing medical services at the Premises pursuant to the terms and conditions of this Sublease and the fulfillment of the obligations under the Lease.

(*See* Exhibit 2, p. 2.)

47.     Plaintiff Nortek's claims in this lawsuit allege unpaid invoices relating to staffing services at Jellico Regional Hospital that arise from the Sublessee's use of and provision of medical services at the Premises and, therefore, both contractual indemnity provisions apply to Nortek's claims. To the extent Plaintiff Nortek demonstrates and establishes that the Defendant/Third-Party Plaintiff JRH is liable to Plaintiff for any alleged damages related to unpaid invoices made the basis of its lawsuit, then JRH pleads that Cross-Defendant, PHG, and Third-Party Defendants, PHJ and Whitwell, are liable for any such damages. Therefore, Defendant/Third-Party Plaintiff, JRH, is entitled to

contractual indemnity from PHG, PHJ, and Whitwell for all liability that is found in Nortek's claims against JRH, if any.

### III.    ALTER EGO/PIERCING THE CORPORATE VEIL

48.    JRH incorporates the above paragraphs as if set forth in full here.

49.    PHG's sole Member was Quentin Whitwell.  Quentin Whitwell was also the sole Member of PHJ.   When PHG was obligated to perform an act under the APA, it could only do so through Whitwell.  Whitwell controls these limited liability companies without question and directly funnels the income of these entities to himself.  PHG and PHJ are merely the alter egos for Whitwell, and he treats them as though they were his own personal assets.

50.    Whitwell does not treat these companies like separate legal entities.  For example, Whitwell does not hold Member meetings or votes, does not maintain corporate procedures, does not keep bylaws, and does not prepare and distribute financial reports.  Aside from PHJ's one Joint Written Consent adopting by resolution the execution of the "Bring Down Certificate", no corporate formalities were maintained by Whitwell for PHG or PHJ.

51.    The result of all this is that Whitwell is disregarding the limited liability company structure which Texas law authorizes by refusing to conduct his business in accordance with the laws of the state of Texas (and Mississippi and Tennessee for that matter) by misrepresenting the purpose and use of these entities.  There is effectively no difference between these companies (PHG and PHJ) and Whitwell who has direct control over these companies.  PHG and PHJ are the alter egos of Whitwell and any corporate veil for these limited liability companies should be pierced to make Whitwell liable for damages in his individual capacity.  Whereever it is alleged that PHG or PHJ committed a fraudulent act, the allegations are meant to include Whitwell in his individual capacity, as well.

## IV.     COMMON LAW FRAUD

52.     JRH incorporates the above paragraphs as if set forth in full below.

53.     Pleading further and in the alternative, PHG, PHJ and Whitwell are liable to JRH for common law fraud.  The elements of common law fraud in Texas are a material misrepresentation that was false, was known to be false when made or was made recklessly as a positive assertion without knowledge of its truth, that was intended to be acted upon, that was relied upon, and which caused injury.

54.     Here, PHG and Whitwell committed fraud by making the material misrepresentations that PHG, and later that PHJ, would operate Jellico Regional Hospital after the sale of the hospital and take over JHR's lease by assignment or get its own lease, that PHG and Whitwell would make commercially reasonable efforts to replace the personal guarantee for the Pathway Loan of Kirnjot Singh, MD with a corporate guarantor or Quentin Whitwell as approved by the lender, and that PHG and Whitwell would pay the liabilities assumed before closing under Section 1.3 of the APA up to $450,000.  Furthermore, PHJ also represented it had the financial capability to close on the APA transaction, but it did not even have a bank account.

55.     PHG, PHJ, and Whitwell have not done any of these things which they represented they would do.  PHG, PHJ, and Whitwell have not assumed JRH's lease or entered into a new lease with the City of Jellico.  PHG, PHJ, and Whitwell have not made any real effort to replace Dr. Singh as the personal guarantor on the Pathway Loan.  And clearly, PHG, PHJ, and Whitwell have not been paying for services rendered on the contracts that they assumed. These acts and omissions constitute fraud on the part of PHG, PHJ, and Whitwell.

56.     Further, PHJ and Whitwell committed fraud when Whitwell made affirmative misrepresentations in the Bring Down Certificate that each of the covenants and agreements of the buyer of the hospital had already satisfied the obligations in the APA.  Whitwell had actual

knowledge at the time of executing this document on January 29, 2024, that PHJ had not, in fact, satisfied many of its obligations and promises under the APA.  Neither PHJ nor PHG had made commercially reasonable efforts to replace the personal guarantee for the Pathway Loan of Kirnjot Singh, MD with a corporate guarantor or Quentin Whitwell, neither PHJ nor PHG were paying on the contracts they assumed, and neither PHJ nor PHG had paid the accounts payable up to cap of $450,000.

57.     PHJ was created for the purpose of PHG to try to avoid liability on the APA it entered into in December of 2023.  PHJ had just been created a mere six days earlier and did not even have the financial resources to fulfil the promises it and PHG had made.  Neither PHG nor PHJ had confirmed that REH eligibility for the hospital to operate and they already planned to walk away from the deal.

## V.     STATUTORY FRAUD

58.     JRH incorporates the above paragraphs as if set forth in full here.

59.     Pleading further and in the alternative, PHG, PHJ, and Whitwell are liable to JRH for statutory fraud.  The Texas Business and Organizations Code §21.223 provides:

> A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares, or any affiliate of such holder, owner, or subscriber of the corporation, may not be held liable individually to the corporation or its obliges in regards to any contractual obligation, or any other matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation on the basis of actual and constructive fraud, a sham to perpetrate a fraud, or other similar theory . . .

> Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the oblige demonstrates that the holder, beneficial owner, subscriber, or affiliate **caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the oblige primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.**

60.     Thus, §21.223 mandates that any such individuals defined therein can be ***personally liable*** for any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality including failure to:

    a. Comply with this code or the articles of incorporation or bylaws of the corporation; or
    b. Observe any requirement prescribed by this code or the articles of incorporation or bylaws of the corporation for acts to be taken by the corporation or its directors or shareholders.

61.     Although §21.223 uses the term "corporation," the Texas Business Organization Code at §101.002 expressly states that this provision applies to limited liability companies and their members. ("Section 21.223 appl[ies] to a limited liability company and the company's members, owners, assignees, affiliates, and subscribers.").

62.     Next, the Texas Business and Commerce Code at §27.01 makes actionable fraud in a transaction involving real estate or stock in a corporation or joint stock company.  It expressly states as follows:

27.01   Fraud in Real Estate and Stock Transactions.

(a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

    (1) false representation of a past or existing material fact, when the false representation is
        (A) made to a person for the purpose of inducing that person to enter into a contract; and
        (B) relied on by that person in entering into that contract; or

    (2) false promise to do an act, when the false promise is
        (A) material;
        (B) made with the intention of not fulfilling it;
        (C) made to a person for the purpose of inducing that person to enter into a contract; and
        (D) relied on by that person in entering into that contract.

(b) A person who makes a false representation or false promise commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for actual damages.

(c) A person who makes a false representation or false promise with actual awareness of the falsity thereof commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages. Actual awareness may be inferred where objective manifestations indicate that the person acted with actual awareness.

(e) Any person who violates the provisions of this section shall be liable to the person defrauded for reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court.

* * * *

63.    PHJ is also liable for fraud in a real estate transaction by not abiding by the terms of its Sublease and not later either taking an assignment of the lease with the City of Jellico or make its own lease.  Quentin Whitwell is personally liable for this fraud as per the Texas Business Organization Code at §21.223.  Note that intent is irrelevant under subsection (b).  Intent or actual awareness of the false representations allow for recovery of exemplary damages under subsection (c).

64.    Next, the Texas Business and Commerce Code §24.006 also prevents a fraudulent transfer as to a credit regarding a transfer made or obligation incurred by a debtor if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation. Additionally, a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.  Notably, again, intent is irrelevant under §24.006.

65.     Here, PHG has contended that it transferred its obligations under the APA to PHJ to operate the hospital and such transfer was a novation of the contract, which JRH disputes. However, even if that occurred, PHJ had no assets at the time, was not collateralized, and was effectively insolvent.  When PHG purportedly assigned the APA, PHG did not receive a reasonably equivalent value in exchange for the transfer and knew that it would not receive anything of value because it attempted to transfer the APA to an insolvent company.  Intent is irrelevant under the statute, but PHG, PHJ, and Whitwell would have had actual knowledge of the fraud in these transactions because Whitwell was the only Member of both PHG and PHJ, and Whitwell is the alter ego of PHG and PHJ and executed agreements on behalf of both companies.

## VI.     FRAUD IN THE INDUCEMENT AGAINST PHG AND WHITWELL

66.     JRH incorporates the above paragraphs as if set forth fully here.

67.     Pleading further, and in the alternative, PHG and Whitwell are liable to JRH for fraud in the inducement to enter the APA contract.  PHG and Whitwell induced JRH to enter the APA contract by leading Dr. Singh and JRH to believe that PHG and Whitwell were going to purchase the assets of the hospital, operate the hospital, find another guarantor for the Pathways Lending Loan, assume on-going contracts, and assume liability for the accounts payable up to a limit of $450,000.

68.     However, PHG and Whitwell never intended PHG to operate the hospital, never intended to find a guarantor for the loan, and never intended to pay the liabilities.  Rather, PHG and Whitwell intended all along to create a new limited liability company, PHJ, and did so a mere six days before the closing on January 23, 2024.  PHJ did not even exist at the time JRH and PHG entered into the contract for transfer of the hospital to PHG.  Subsequent events have made clear that Whitwell created PHJ as a shell company without any assets of its own in a feeble attempt to insulate PHG from any liability of its own contending that it assigned all of its obligations to PHJ

as if there had been a novation of the APA agreement.  PHG contends that it does not have liability under the APA despite Section 12.8 which expressly states that Purchaser (PHG) remains responsible for the obligations despite any assignment.

69.     Had JRH known that PHG was going to perform a "bait and switch" and create PHJ to then try argue that PHG does not have any liability under the APA, JRH would never have entered into the APA contract with PHG.  PHG's and Whitwell's actions in inducing JRH to enter into the APA with PHG all the while intending to switch the Purchaser with one that had no assets or experience operating a hospital was fraudulent.

## VII.     FRAUD IN THE INDUCEMENT AGAINST PHJ

70.     JRH incorporates the above paragraphs as if set forth fully here.

71.     Pleading further, and in the alternative, PHJ and Whitwell are liable to JRH for fraud in the inducement to finalize the APA contract.  By executing the Bring Down Certificate, PHJ and Whitwell induced JRH to believe that it was going to operate the hospital, it had found another guarantor for the Pathways Lending Loan, it had assumed on-going contracts and was paying on them, and it had paid the accounts payable up to a limit of $450,000.

72.     However, none of this was true.  PHJ and Whitwell did not find a guarantor for the loan, and did not pay the accounts payable, and did not pay the liabilities which they were incurring.  JRH turned over operations of the Jellico Regional Hospital to PHJ and Whitwell based upon these representations, to the detriment of JRH, and really, the community of Jellico, Tennessee which no longer has a hospital.  These actions constitute a separate cause of action for fraud in the inducement against PHJ.

## VIII.   PROMISSORY ESTOPPEL AGAINST PHG AND WHITWELL

73.     Pleading further, and in the alternative, in December of 2023, PHG and Whitwell promised JRH that PHG and Whitwell would make commercially reasonable efforts to replace the

personal guarantee for the Pathway Loan of Kirnjot Singh, MD with either a corporate guarantor or Quentin Whitwell as approved by the lender, and that PHG and Whitwell would pay the liabilities assumed before closing under Section 1.3 of the APA up to $450,000.  JRH reasonably relied upon PHG and Whitwell's promise by entering into the APA agreement, assigning its contracts with vendors to PHG to utilize and pay.

74.    However, PHG and Whitwell did not follow through with their promises.  As a result of JRH's reliance on PHG and Whitwell's promises, JRH suffered damages, including but not limited to, lawsuits brought by Pathways Lending for default of its loan, defaults on accounts payable with PHG and Whitwell had assumed, lawsuits brought by third-party vendors for default on invoices for services rendered, damage to credit, damage to business reputation and goodwill with its vendors, costs and attorneys' fees incurred in the defense of those actions, and costs and attorneys' fees incurred for having to bring this action.

75.    PHG and Whitwell made clear and definite promises to JRH, which PHG and Whitwell should have reasonably expected that JRH would rely upon and wanted JRH to rely upon.  It should be no surprise that JRH did, in fact, reasonably rely on these promises to its detriment.  Injustice to JRH can only be avoided by enforcement of PHG and Whitwell's promises.

## IX.    PROMISSORY ESTOPPEL AGAINST PHJ

76.    In January of 2024, PHJ promised JRH that it would sublease the Jellico Regional Hospital from JRH under its lease with the City of Jellico including paying the rent and taking over the operations of the hospital in its Sublease agreement.  PHJ also made representations and warranties that the buyer of the hospital had satisfied the covenants and obligations in the APA in order to finalize the agreement to take over operation of the hospital.  Whitwell had actual knowledge at the time of executing this document on January 29, 2024, that the buyer had not, in

fact, satisfied many of its obligations and promises under the APA. Neither PHJ nor PHG had made commercially reasonable efforts to replace the personal guarantee for the Pathway Loan of Kirnjot Singh, MD with a corporate guarantor or Quentin Whitwell, neither PHJ nor PHG were paying on the contracts they assumed, and neither PHJ nor PHG had paid the accounts payable up to cap of $450,000.

77.     By March 9, 2024, PHJ breached its promises to JRH. JRH reasonably relied upon PHJ's promises by entering into the Sublease agreement with it and to finalize the APA. As a result of JRH's reliance on PHJ's promises, Plaintiff suffered damages including but not limited to default on its Lease agreement with no ability to generate the income to make the payments, damage to credit, damage to business reputation and goodwill with its vendors, costs and attorneys' fees incurred in the defense of those actions, and costs and attorneys' fees incurred for having to bring this action.

78.     PHJ made clear and definite promises to JRH, which PHJ should have reasonably expected that JRH would rely upon and wanted JRH to rely upon. It should be no surprise that JRH did, in fact, reasonably rely on these promises to its detriment. Injustice to JRH can only be avoided by enforcement of PHJ's promises to it.

## DAMAGES ON ALL CAUSES OF ACTION

79.     JRH has suffered real and significant damages as a result of the acts and omissions of PHG, PHJ, and Whitwell. JRH has exposure to damages in excess of $9 million at this point. JRH's damages arise from breach of the City of Jellico's Lease and PHJ's failure to either take over that lease or make its own with the city, breach of payments on the Pathway Loan and failure to replace the personal guarantor, and unpaid Accounts Payable such as Nortek's invoices. JRH has also incurred damages as attorneys' fees from the defense of multiple lawsuits for unpaid invoices on contracts which PHG assumed and were supposed to pay and a suit by Pathway for

the breach of its loan for $1.5 million.  JRH and its Members have also suffered damage to its business reputation and goodwill with its vendors and business contacts by PHG, PHJ, and Whitwell's failure to pay invoices on assumed contracts and default on its account payable obligations.

## ATTORNEYS' FEES

80.     Under Texas law, all of Defendant/Third-Party Plaintiff JRH's causes of action allow the recovery of attorneys' fees.  JRH engaged the undersigned attorney to prosecute this Cross-Claim against PHG and this Third-Party Complaint against PHJ and Whitwell.  JRH has agreed to pay reasonable attorneys' fees and expenses through trial and any appeal.

81.     JRH is entitled to recover reasonable and necessary attorneys' fees pursuant to Texas Civil Practice and Remedies Code Sections 38.001-38.003 because JRH is represented by an attorney, presented the claim to Defendant, and Defendant did not tender the amount owed before the expiration of the 30th day after the claim was presented.  JRH therefore prays that it be awarded all reasonable and necessary attorneys' fees incurred in prosecuting JRH's causes of action through trial and any appeal.

## EXEMPLARY DAMAGES

82.     Because of PHG, PHJ, and Whitwell's fraud, statutory fraud, and fraud in the inducement, Third-Party Plaintiff JRH is entitled to exemplary damages in addition to actual damages.

## JURY DEMAND

83.     JRH demands that its causes of action be tried to a jury as to all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Defendant/Third-Party Plaintiff JRH demands a judgment for specific performance that PHG and Whitwell perform their obligations under the APA and PHJ perform its

obligations under the Sublease or for monetary damages resulting from their fraud and breach of these agreements including consequential damages. In addition, JRH demands a judgment for contractual indemnity, in an amount to be determined at trial, against the PHG and Whitwell, to the extent that JRH is found liable to Plaintiff Nortek, if at all, on Nortek's claims against JRH and indemnity for attorneys' fees, costs, and expenses incurred in this matter.

For these reasons, Defendant/Third-Party Plaintiff, JRH, prays for judgment against PHG, PHJ and Whitwell for actual damages, exemplary damages, attorneys' fees as damages, attorneys' fees through trial and appeal, pre- and post-judgment interest, costs of court, and all such other and further relief, general or special, at law or in equity, to which Plaintiff is justly entitled.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:    */s/ Peri H. Alkas*

       Peri H. Alkas; SBN 00783536
       Nicole M. Hilburn; SBN 24055663
       ONE SHELL PLAZA
       910 Louisiana Street, Suite 4300
       Houston, Texas 77002
       Telephone: 713-626-1386
       Telecopier: 713-626-1388
       Email: peri.alkas@phelps.com
            nicole.hilburn@phelps.com

**ATTORNEYS FOR DEFENDANT,**
**JELLICO REGIONAL HOSPITAL, LLC**

Asset Purchase Agreement

by and between

Jellico Regional Hospital, LLC

and

Progressive Health Group, LLC

Dated as of December 22, 2023

Page 1 of 24

EXHIBIT
1

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of December 22, 2023 (including all Schedules and Exhibits hereto, this "Agreement"), by and among **Jellico Regional Hospital, LLC**, a Texas limited liability company (the "Seller"), and **Progressive Health Group, LLC** a Mississippi limited liability company and its assigns ("Purchaser"). Seller and Purchaser may be referred to each herein as a "Party" and collectively as the "Parties."

WHEREAS, the Seller is duly licensed by the state of Tennessee as an acute care hospital located at 188 Hospital Ln, Jellico, TN 37762 ("Hospital") and certified by the Centers for Medicare and Medicaid ("CMS") as a Critical Access Hospital ("CAH"); and

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller, all of the Assets as more specifically provided herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, Purchaser shall purchase, acquire, and accept from Seller, and Seller shall sell, transfer, assign, convey, and deliver to Purchaser (the "Contemplated Transactions"), all of Seller's respective right, title, and interest in, to, and under all assets of every kind, character, or description, whether real, personal, or mixed, tangible or intangible, owned, leased, or licensed by Seller on the Closing Date that are held for use or used in the Hospital, free and clear of any and all Encumbrances (collectively, "Purchased Assets"). The Purchased Assets shall include, but may not be limited to, the following items:

(a)     the right to receive and collect all Accounts Receivable from the rendering of services and provision of medicine, drugs and supplies to patients by the Seller in connection with the Hospital after the Closing Date arising from payor sources and from patients.

(b)     all rights of Seller with respect to the Leased Property ("Hospital Lease"), together with all improvements and fixtures thereto and other appurtenances and rights in respect thereof;

(c)     all tangible personal property owned, leased, or licensed by the Seller with respect to the operation of the Hospital, including but not limited to the following: (i) the Furniture and Equipment, (ii) the tools, spare parts, supplies and other tangible personal property owned by or used by Seller in the conduct of the Hospital and located in the Ordinary Course of Business at the Leased Property or the property subject to the Real Property Leases (all such Personal Property Leases, collectively, the "Purchased Personal Property Leases");

(d)     all Inventory and Pre-Paid Expenses of the Seller related to the operation of the Business;

(e)     (i) the Purchased Intellectual Property, (ii) the rights of Seller as licensor under the Intellectual Property Licenses and (iii) any right or interest of Seller in the Marks;

Page 2 of 24

JELLICO 0009

(f)     all Documents, including all relevant Policies and Procedures of Seller, that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to the services provided by the Business, the marketing of the Business's services (including advertising and promotional materials), Purchased Intellectual Property, personnel files for Transferred Employees and files including credit information and supplier lists, to the extent physically located on any of the premises of the Hospital, but excluding (i) personnel files for Employees of Seller who are not Transferred Employees, (ii) such files (if any) as may not be provided to Purchaser hereunder in compliance with applicable Law regarding privacy, (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third-party, and (iv) any Documents primarily related to or required to realize the benefits of any Excluded Assets;

(g)     all Permits used by Seller in the Business to the extent assignable or transferable;

(h)     to the extent transferable to Purchaser, all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and agents of Seller or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(i)     to the extent transferable or assignable, (i) any and all provider agreements of Seller for the Business with third-party payors, including but not limited to Government Reimbursement Programs or Private Reimbursement Programs; and (ii) all provider numbers, CMS Certification Numbers, or any other number of Seller used to bill Seller's services for the Business and collect from a third-party payor, including but not limited to a Government Reimbursement Program or Private Reimbursement Program;

(j)     all rights of Seller, to the extent transferable, under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to services provided to Seller after the Closing Date in connection with the Business or to the extent affecting any Purchased Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(k)     all Patient Records; and

(l)     all goodwill and other intangible assets associated with the Business.

1.2     Excluded Assets. The following assets shall be excluded from the transfer and sale from the Seller to the Purchaser:

(a)     All Accounts Receivable relating to dates of service prior to Closing Date, all cash, cash equivalents, bank deposits or similar cash items of Seller, and all securities owned by Seller. All cash, cash equivalents and deposits prior to the day of Closing Date shall remain with the Seller. All cash deposits relating to services provided prior to the Closing Date shall remain the property of the Seller;

(b)     Any equity in the Seller's Captive Insurance shall be an excluded asset and remain the property of the Seller;

(c)     All Tennessee DHS payments for services provided prior to the Closing Date;

(d)     All Medicare Cost Report settlements for dates of service prior to the Closing Date; and

Page **3** of **24**

JELLICO 0010

(e)     All Tennessee special allocations (emergency, infrastructure, or other) that are allocated to hospitals, rural hospitals and/or critical access hospitals in the state of Tennessee.

1.3     <u>Assumption of Liabilities</u>. Purchaser shall not assume any liabilities occurring before the Closing Date except as listed in this Section 1.3:

(a)     Pathways loan estimated to be One Million Four Hundred Twenty-Five Thousand Six Hundred Fifteen Dollars ($1,425,615.00) ("<u>Pathways Loan</u>").   Purchaser shall use commercially reasonable efforts to replace the personal guarantee for the Pathway Loan of Kirnjot Singh, MD with a corporate guarantor or Quentin Whitwell as approved by the lender; however, Purchaser cannot guarantee that Kirnjot Singh, MD will be released from said guarantee. Commercially reasonable efforts will be used by Purchaser as Seller has represented that the Pathway Loan proceeds were for the benefit and improvement of the Hospital and for no other purpose(s).

(b)     Those Leases and Service Contracts listed in **Exhibit A** (the "Assumed Contracts").

(c)     Accounts payable ("<u>AP</u>") not to exceed Four Hundred Fifty Thousand Dollars ($450,000.00) (the "AP Cap").

## ARTICLE II

## CONSIDERATION

2.1     <u>Consideration</u>. The aggregate consideration ("<u>Purchase Price</u>") for the Purchased Assets shall be:

(a)     Assumption of the Pathways Loan, subject to the conditions set forth in Section 1.3(a);

(b)     The assumption of the Assumed Contracts; and

(c)     The assumption of accounts payable of up to the AP Cap.

2.2     <u>Payment of Purchase Price</u>. Subsequent to the Closing Date, the Parties shall act in good faith (i) to transfer the Assumed Contracts from the Seller to the Purchaser and (ii) the assumption of the Pathway Loan and substitution of the guarantor as described in <u>Section 1.3(a)</u>.

## ARTICLE III
## CLOSING AND TERMINATION

3.1     <u>Closing Date</u>. The closing of the Contemplated Transactions (the "<u>Closing</u>") shall take place (the "<u>Closing Date</u>") at a date and time agreed by the Parties, which is expected to be _____.

3.2     <u>Deliveries by Seller</u>. At the Closing, Seller shall deliver to Purchaser:

(a)     one or more duly executed bills of sale in the form of **Exhibit B** (the "Bill of Sale"); and

(b)     all other instruments and documents, in form and substance reasonably acceptable to Purchaser, as may be necessary to effect the Contemplated Transactions.

Page 4 of 24

3.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Seller:

        (a)     one or more duly executed bills of sale in the form of **Exhibit B** (the "Bill of Sale"); and

        (b)     all other instruments and documents, in form and substance reasonably acceptable to Seller, as may be necessary to effect the Contemplated Transactions.

3.4     Termination of Agreement.  Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time: (i) on or prior to the Closing Date by mutual consent of the Parties; (ii) on the Closing Date by the Purchaser if any of the conditions specified in Article VIII of this Agreement have not been satisfied and shall not have been waived by Purchaser; (iii) by Purchaser or Seller if the Closing Date shall not have taken place on or before _____ (which date may be extended by mutual agreement of Purchaser and Seller); or (iv) by Purchaser if Purchaser reasonably determines that any of the representations and warranties set forth in Article IV are incorrect.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to Purchaser to enter into this Agreement, as of the date hereof and (except in cases where the representation speaks as of another date, such as the date hereof, in which case as of such date) as of the Closing Date, Seller, represents and warrants to Purchaser that:

4.1     Organization and Good Standing.  Seller is a limited liability company duly organized, validly existing and in good standing under the laws of Texas and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Seller is duly qualified or authorized to do business as a foreign company and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a Material Adverse Effect.

4.2     Authorization of Agreement.  Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action necessary for it to validly execute and deliver, each agreement, document, or instrument or certificate contemplated by this Agreement to be executed by Seller in connection with the consummation of the Contemplated Transactions (the "Seller Documents") and to perform its obligations hereunder and thereunder and to consummate the Contemplated Transactions.

4.3     Consents of Third Parties; Contractual Consents.  Seller is not required to obtain any consent, waiver, approval, Order, Permit or authorization of, or to make any declaration or filing with, or to give any notification to, any Person ("Approvals and Permits") in connection with the execution and delivery of this Agreement or the Seller Documents by Seller, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the Contemplated Transactions or the taking by Seller of any other action contemplated hereby or thereby, except for (i) the Healthcare Regulatory Consents, and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications of which the failure to have obtained or made same would not have a Material Adverse Effect.

Page 5 of 24

4.4     Title; Purchased Assets.

(a)     Except the Hospital Lease, Purchased Personal Property Leases, and intellectual property licensed to Seller, Seller owns each of the Purchased Assets, and Purchaser will be vested with good and marketable title to such Purchased Assets, free and clear of all Encumbrances.

(b)     The Purchased Assets constitute all assets that are held or used by Seller or any Affiliate or otherwise necessary for the conduct of the Hospital substantially in the manner conducted as of the date of this Agreement and consistent with past practice.

4.5     Financial Information.

(a)     Seller has provided all true and correct copies of the unaudited consolidated balance sheet of the Seller as of October 31, 2023 (collectively the "Interim Balance Sheet") and internal profit loss statements ("Internal P&L"). All of the foregoing financial statements (including the notes thereto, if any) are hereinafter collectively referred to as the "Financial Statements."

(b)     The Financial Statements present fairly, in all material respects, the financial position and results of operations of Seller, on a consolidated basis, as of the dates and for the periods indicated, in each case in conformity acceptable accounting principles on a consistent basis throughout the periods covered thereby, with the exception of the required footnote disclosures.

4.6     Taxes.    Seller has timely (taking into account extensions of time to file) paid and filed all Tax Returns required to be filed by such Seller through the date of this Agreement and will pay and file all Tax Returns required to be filed by it prior to the Closing Date. There is no audit, examination, investigation, appeal, litigation or other proceeding currently pending with respect to Taxes relating to the Purchased Assets.

4.7     Intellectual Property.    Seller has disclosed in writing a description of all Purchased Intellectual Property. Seller owns or has licenses to use all of the Purchased Intellectual Property; provided, however, that Seller makes no representation or warranty as to the ownership by the licensor of any intellectual property that is licensed to Seller.

4.8     Employees.    Prior to the date hereof, Seller has delivered to Purchaser a list of all of its Employees as a of recent date indicating their position, current annual rate of compensation, or current hourly wage rate or other basis of compensation and date of hire by Seller. Seller shall terminate all employees as of the Closing Date.

4.9     Labor.    Seller is in compliance in all material respects with all Laws respecting employment and employment practices, terms and condition of employment, and wages and hours, labor relations, safety and health.

4.10    Governmental Body Permits and Approvals.    Seller holds the permits and licenses sufficient to operate the Hospital all of which are in full force and effect and unimpaired.

4.11    Government Reimbursement Program Participation/Accreditation.    Seller is eligible to receive payment under Titles XVIII and XIX of the Social Security Act and is a "provider" under existing provider agreements with Government Reimbursement Programs through the applicable Medicare Administrative Contractors.

4875-7375-0681 v.4

4.12    Financial Advisors. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

4.13    Litigation. There are no Legal Proceedings pending or, to the Knowledge of Seller, threatened against the Seller or its Affiliates, or to which the Seller or its Affiliates is otherwise a party before any Governmental Body, which, if adversely determined, would likely result in a Material Adverse Effect or would be reasonably likely to adversely and materially affect the Purchased Assets.

4.14    FIRPTA. Seller is not a "foreign person" within the meaning of section 1445 of the Code.

4.15    Seller Duty to Disclose. From date hereof until the date of Closing, promptly upon discovery thereof by Seller, Seller shall disclose to Purchaser, in writing, any material inaccuracies or variances with respect to its representations and warranties contained in this Agreement.

4.16    Medicare Participation / Accreditation / Compliance. To the best of Seller's knowledge, the Hospital is qualified for participation in the Medicare, Medicaid and TriCare/CHAMPUS programs, has a current and valid provider contract with such programs, is in compliance in all material respects with the applicable conditions of participation in such programs and has received all material approvals or qualifications necessary for reimbursement of services or items provided by the Hospital to applicable beneficiaries. To the best of Seller's knowledge, the Hospital is duly accredited by the Center for Improvement in Healthcare Quality and such accreditation is in good standing. To the best of Seller's knowledge, all billing practices of the Seller with respect to the Hospital to all third party payors, including the Medicare, Medicaid and TriCare/CHAMPUS programs and private insurance companies, have been in compliance with all material applicable laws, regulations and policies of such third party payors and the Medicare, Medicaid and TriCare/CHAMPUS programs, and Seller has not billed or received any payment or reimbursement in excess of amounts allowed by law. The Hospital has not been excluded from participation in the Medicare, Medicaid or TriCare/CHAMPUS programs, nor is any such exclusion threatened. Except as set forth in a writing delivered by Seller to Purchaser or as set forth on Schedule 4.16, to the best of Seller's knowledge within the past five (5) years, the Seller has not received any written notice from any of the Medicare, Medicaid or TriCare/CHAMPUS programs, or any other third party payor programs of any pending or threatened investigations or surveys. Except as set forth on Schedule 4.16 and to the best of Seller's knowledge, Seller (i) is not a party to a Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services, (ii) has no reporting obligations pursuant to any settlement agreement entered into with any Government Entity, (iii) has not been within the past five (5) years the subject of any governmental payer program investigation conducted by any federal or state enforcement agency, (iv) is not and has not been within the past five (5) years a defendant in any unsealed qui tam/False Claims Act litigation, (v) during the past five (5) years has not been served with or received any search warrant, subpoena, civil investigative demand, or contact letter or telephone or personal contact by or from any federal or state enforcement agency, and (vi) has not, during the past five (5) years received any written complaints from any employee, independent contractor, vendor, physician or other person or organization that would indicate that such Seller has violated any law applicable to the Hospital.

4.17    Regulatory Compliance. To the best of Seller's knowledge, except as set forth in writing delivered by Seller to Purchaser or as set forth on Schedule 4.17, the Hospital is in compliance in all material respects with statutes, rules, regulations, and requirements of the Government Entities having jurisdiction over the Hospital and the operations of the Hospital or its related ancillary services. As used herein, "Government Entity" means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local. To the best of Seller's knowledge, the Seller has filed all materially required reports,

Page **7** of **24**

data and other information required to be filed with the Government Entities. Neither the Seller, nor any of the Seller's employees providing services at the Hospital, has violated any material federal or state laws, rules or regulations relating to health care fraud, waste or abuse, including, but not limited to, the federal Anti-Kickback Law, 42 U.S.C. § 1320a-7b, as amended, the Stark laws and regulations, 42 U.S.C. § 1395nn, as amended, and 42 C.F.R. §§411.350 – 389, as amended, and the False Claims Act, 31 U.S.C. § 3729, et seq., as amended. To the best of Seller's knowledge, the Seller is in compliance in all material respects with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act") and all rules and regulations promulgated pursuant to HIPAA and the HITECH Act.

4.18     No Other Representations or Warranties. Except for the representations and warranties contained in this ARTICLE IV, no Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained in ARTICLE IV hereof, Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As of the date hereof and (except in cases where the representation speaks as of another date, such as the date hereof, in which case as of such date) as of the Closing Date, Purchaser hereby represents and warrants to Seller that:

5.1     Organization and Good Standing. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Mississippi and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

5.2     Authorization of Agreement. Purchaser has full corporate power, legal capacity and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the Contemplated Transactions (the "Purchaser Documents"), and to consummate the Contemplated Transactions. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document has been duly authorized by all necessary action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and

Page **8** of 24

JELLICO 0015

delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms.

5.3     Conflicts; Consents of Third Parties.

(a)     Purchaser is not required to obtain any consent, approval, authorization, waiver, Order, license or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the Contemplated Transactions or the taking by Purchaser of any other action contemplated hereby or thereby, except for compliance with the Healthcare Regulatory Consents.

(b)     To Purchaser's knowledge, none of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Contemplated Transactions.

5.4     Litigation.  There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the Contemplated Transactions.  Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the Contemplated Transactions.

5.5     Financial Advisors.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Contemplated Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

5.6     Financial Capability.  Purchaser (i) has, and at the Closing will have, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the Contemplated Transactions, (ii) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

5.7     Healthcare Regulatory Compliance Status.

(a)     To the knowledge of Purchaser neither Purchaser nor any of its Affiliates is involved in any litigation, proceeding, or investigation by or with any Governmental Authority which, if determined or resolved adversely, would have an adverse impact on the ability of Purchaser to obtain or maintain any governmental qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations necessary for Purchaser to conduct the Business and to own or use the Purchased Assets, as the Business is conducted and the Purchased Assets are owned and used on the date hereof, where the failure to have such qualifications, registrations, filings, licenses, permits, orders, approvals or

Page **9** of **24**

authorizations could reasonably be expected to prevent or materially delay the consummation of the Contemplated Transactions or the performance by Purchaser of any of its obligations under this Agreement.

(b)      (i) no employee or independent contractor of Purchaser (whether an individual or entity) has been excluded from participating in any federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and (ii) neither Purchaser nor any of the officers, directors, agents or managing employees (as such term is defined in 42 U.S.C. § 1320a-5(b)) of Purchaser has been excluded from participating in Medicare or any federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)) or been subject to sanction pursuant to 42 U.S.C. § 1320a-7a or 1320a-8 or been convicted of a crime described at 42 U.S.C. § 1320a-7b. Purchaser does not know of any reason why the approvals or Permits required for Purchaser to consummate the Contemplated Transactions would be delayed or rejected.

5.8      _Acknowledgement Regarding Condition of the Business_.    Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in ARTICLE IV hereof (as modified by the Schedules hereto as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred to and accepted by Purchaser in an "as is," "where is" and "with all faults" condition, fee of any warranties or representations whatsoever, and Seller EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, LATENT OR PATENT, WITH RESPECT THERETO. Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in ARTICLE IV hereof (as modified by the Schedules hereto as supplemented or amended). Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller, the Business or the Contemplated Transactions not expressly set forth in this Agreement, and none of Seller, any of its Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Business and the Contemplated Transactions. Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the Contemplated Transactions, Purchaser has relied on the results of its own independent investigation. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES THAT SELLER HAS NOT MADE ANY REPRESENTATION RELATING TO THE OWNED PROPERTY OR ANY PROPERTY THAT IS THE SUBJECT OF A REAL PROPERTY LEASE REGARDING SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, COMPLIANCE WITH ZONING LAWS, OR ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES, REGULATIONS OR ORDINANCES RELATING TO THE USE THEREOF, EXCEPT AS EXPRESSLY STATED HEREIN. PURCHASER ALSO ACKNOWLEDGES AND AGREES THAT THE INSPECTION AND INVESTIGATION OF THE PURCHASED ASSETS BY PURCHASER AND ITS REPRESENTATIVES HAS BEEN ADEQUATE TO ENABLE PURCHASER TO MAKE PURCHASER'S OWN DETERMINATION WITH RESPECT TO THE SUITABILITY OR FITNESS OF THE LAND, INCLUDING WITH RESPECT TO SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, ZONING LAWS, AND ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES REGULATIONS OR ORDINANCES. PURCHASER ACKNOWLEDGES THAT THE DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS PARAGRAPH ARE AN INTEGRAL PORTION OF THIS AGREEMENT.

4875-7375-0681 v.4

JELLICO 0017

## ARTICLE VI

## COVENANTS

6.1     Access to Information.  Subject to this Section 6.1, and subject to compliance with applicable Antitrust Laws, Seller agrees that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the assets, properties and operations of the Business and such examination of the books and records of Seller pertaining to the Hospital, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records at Purchaser's sole expense; it being understood, however, that the foregoing shall not entitle Purchaser to access (i) the books, records and documents referred, (ii) any books, records or documents access to which by Purchaser Seller reasonably determines would be competitively disadvantageous to Seller in any material respect or (iii) any books, records or documents the disclosure of which by Seller to Purchaser would (A) violate any patient confidentiality obligation of Seller or (B) any other agreement or any obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or (C) any obligation of confidentiality by which Seller is bound under applicable Law.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to any restrictions on disclosure by Seller to Purchaser or use of the information contained therein by Purchaser applicable pursuant to any agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law.  Seller shall cause its officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Seller and its representatives and shall use their reasonable efforts to minimize any disruption to Seller's business and operations, including the Business. Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, Seller, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller.

6.2     Conduct of the Business Pending the Closing.  Prior to the Closing, Seller shall conduct the Business in the Ordinary Course of Business.

6.3     Patient Record Transition.  Within thirty (30) calendar days of the Closing Date Purchaser shall assume the CPSI contract.

6.4     Consents.

(a)     Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller to obtain at the earliest practicable date all consents, approvals, authorizations, waiver and Orders required to be obtained by Seller, and to give at the earliest practicable date any notices required to be given by Seller, in order for Seller to consummate the Contemplated Transactions on the terms and in the manner provided hereby; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or legal proceedings to obtain any such item.

(b)     Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with Purchaser to obtain at the earliest practicable date all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date any notices required to be given by Purchaser, in order for Purchaser to consummate the Contemplated

Page **11** of **24**

JELLICO 0018

Transactions on the terms and in the manner provided hereby and to operate the Business after the Closing; provided, however, that Purchaser shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Authority) or to initiate any litigation or legal proceedings to obtain any such consent or approval.

6.5    Insurance. Seller shall cause the Insurance Policies to remain continuously in force through and including the date of Closing. As of the Closing, Purchaser shall have appropriate insurance coverage in place for the Business consistent with what would be maintained under good industry business practices.

6.6    Regulatory Approvals.

(a)    Purchaser, at its own cost and expense, shall, within ten (10) Business Days after the date of Closing, submit those Healthcare Regulatory Consent required in order for Purchaser to consummate the Contemplated Transactions and to operate the Business in accordance with Law (collectively, the "Healthcare Applications"). Purchaser shall diligently pursue the Healthcare Applications and shall timely submit all information and documents requested in connection therewith by any Governmental Body.

(b)    If necessary, Purchaser and Seller shall (a) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any applicable Law including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices, as promptly as practicable, (b) comply at the earliest practicable date with any request for additional information, documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or the Contemplated Transactions, and (c) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable law, providing copies of all such documents to the non-filing Parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Body under such Laws with respect to any such filing or any such transaction.

(c)    Each such Party shall use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Contemplated Transactions. Each such Party shall promptly inform the other Parties hereto of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No Party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other Parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

6.7    Further Assurances. Each of Seller and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Contemplated Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions.

6.8    Confidentiality. Purchaser acknowledges that the Confidential Information provided to it in connection with this Agreement, including pursuant to Section 6.1, and the consummation of the Contemplated Transactions and the terms of this Agreement are confidential and shall not be disclosed to any individual or entity by either Seller or Purchaser without the express written consent of the other Party, except as may be required by law. Purchaser agrees to keep confidential all business practices of Seller confidential.

Page **12** of **24**

6.9     Preservation of Records.  Purchaser agrees that it shall preserve and keep the records acquired from Seller, held by it or their Affiliates relating to the Business for a period of seven (7) years from the Closing Date or the maximum period of time required by law, whichever is longer, and shall make such records and personnel available to the other Party as may be reasonably required by such Party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or other governmental or healthcare payor investigations or audits of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Seller or Purchaser wishes to destroy such records before or after that time, such Party shall first give ninety (90) days prior written notice to the other Party and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

6.10    Publicity.    Neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Contemplated Transactions without obtaining the prior written approval of the other Party hereto, which approval will not be unreasonably withheld or delayed.

6.11    Transition Services.  From and after the Closing for a period of up to one hundred twenty (120) days (the "Transition Period"), Seller and Purchaser may enter into a Billing and Collection Services Agreement substantially in the form attached hereto as Exhibit C (the "Billing and Collection Services Agreement"), pursuant to which Seller will provide billing and collection services to Purchaser in respect of its Accounts Receivable and pay, using Purchaser's funds, Purchaser's post-closing trade accounts payable.

## ARTICLE VII

## EMPLOYEES AND EMPLOYEE BENEFITS

7.1     Offers of Employment. Seller shall provide Purchaser a list of Seller's employees by location and their respective salaries, benefits and job titles.  Purchaser shall identify for Seller which employees it intends to hire as of Closing. Such individuals who accept such offer of employment are hereinafter referred to as the "Transferred Employees." Pursuant to the "Standard Procedure" provided in Section 5 of Revenue Procedure 96-60, 1996-2 C.B. 399, (i) Purchaser and Seller shall report on a predecessor/successor basis as set forth therein, (ii) Seller will not be relieved from filing a Form W-2 with respect to any Transferred Employees, and (iii) Purchaser will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Employees are employed by Purchaser that includes the Closing Date, excluding the portion of such year that such Employee was employed by Seller. Any employee not offered a job with Purchaser shall be terminated at Closing by Seller.

(a)     Nothing contained in this Agreement shall be construed to prevent the termination of employment of any individual Transferred Employee or any change in the employee benefits available to any individual Transferred Employee.

(b)     As between Purchaser and Seller, Seller shall be responsible for all Liabilities with respect to the Transferred Employees referred to in Section 7.1 attributable to their accrued and unused vacation, sick days and personal days through the Closing Date.

Page **13** of **24**

JELLICO 0020

## ARTICLE VIII

## CONDITIONS TO CLOSING

8.1 <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a) <u>Representations and Warranties</u>.  The representations and warranties of Seller set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date); provided, however, that in the event any such representation or warranty has been breached the condition set forth in this <u>Section 8.1(a)</u> shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect;

(b) <u>Compliance with Covenants</u>.  Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date;

(c) <u>Closing Deliverables</u>.  Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in this Agreement.

(d) <u>Hospital Lease</u>. Seller shall have obtained the consent of the landlord to the assignment of the Hospital Lease as a result of the transactions contemplated by this Agreement, such Hospital Lease to be in a form reasonably acceptable to Purchaser.

8.2 <u>Conditions Precedent to Obligations of Seller</u>. The obligation of Seller to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a) <u>Representations and Warranties</u>.  The representations and warranties of Purchaser set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date);

(b) <u>Compliance with Covenants</u> Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date;

(c) <u>Closing Deliverables</u> Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in this Agreement; and

8.3 <u>Conditions Precedent to Obligations of Purchaser and Seller</u>. The respective obligations of Purchaser and Seller to consummate the Contemplated Transactions as provided by this Agreement are

Page 14 of 24

subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

        (a)    <u>Action/Proceeding/Litigation</u>. No Governmental Body shall have issued an Order restraining or prohibiting the Contemplated Transactions; no Governmental Body shall have commenced or threatened in writing to commence any action or suit before any court of competent jurisdiction or other Governmental Body that seeks to restrain or prohibit the consummation of the Contemplated Transactions or impose material damages or penalties in connection therewith. No Legal Proceeding relating to the Contemplated Transactions shall be pending, unless the Parties agree that such Legal Proceeding does not constitute a material obstacle to the consummation of the Contemplated Transactions in accordance with the terms hereof;

## ARTICLE IX

## SURVIVAL

    9.1    <u>Survival of Representations and Warranties</u>. All of the representations and warranties contained in this Agreement, and as explicitly documented in writing in this Agreement, shall survive the Closing hereunder and may be fully and completely relied upon by Seller and Purchaser, as the case may be. The Parties hereto agree that the covenants contained in this Agreement to be performed or otherwise adhered to at or after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof. No oral, verbal, or written representations or warranties by either Party shall be relied upon or shall survive the Closing unless such representations or warranties have been explicitly set forth in writing in this Agreement.

    9.2    <u>Limitation on Damages</u>. Notwithstanding anything to the contrary elsewhere in this Agreement, no Party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive damages of such other Person, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof. Further, any damages owed by one Party to the other Party shall not be owed until the damages alleged by the Party asserting such damages exceed a threshold of $50,000.00.

## ARTICLE X

## TAXES

    10.1    <u>Transfer Taxes</u>. Purchaser shall be responsible for (and shall indemnify and hold harmless Seller and its directors, officers, employees, Affiliates, agents, successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transactions ("<u>Transfer Taxes</u>"). To the extent that any Transfer Taxes are required to be paid by Seller (or such Transfer Taxes are assessed against Seller), Purchaser shall promptly reimburse Seller, as applicable, for such Transfer Taxes. Seller and Purchaser shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes. Seller and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds to Transfer Taxes.

    10.2    <u>Taxes</u>. Purchaser shall be responsible for all real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets (i) accrued during any taxable period commencing after the Closing Date; and (ii) its pro rata share of any taxes accruing during a taxable period that encompasses the Closing Date (in such event, Purchaser shall be liable for the pro rata share accruing

Page <b>15</b> of <b>24</b>

JELLICO 0022

on and after the Closing Date through the end of the applicable tax period. If any Taxes subject to this Section are paid prospectively by Seller, the amount of such Taxes paid shall be paid promptly by Purchaser to Seller.

## ARTICLE XI

## INDEMNIFICATION

11.1     Indemnification by Purchaser. Purchaser shall defend, indemnify and hold harmless Seller and its affiliates, and its and their respective officers, employees, agents or independent contractors (collectively, "Seller Indemnified Parties"), from and against any and all losses, liabilities, damages, costs (including, without limitation, court costs and costs of appeal) and expenses (including, without limitation, reasonable attorneys' fees and fees of expert consultants and witnesses) that such Seller Indemnified Party incurs as a result of, or with respect to (i) any misrepresentation or breach of warranty by Purchaser under this Agreement, (ii) any breach by Purchaser of, or any failure by Purchaser to perform, any covenant or agreement of, or required to be performed by, Purchaser under this Agreement, or (iii) any claim made by a third party with respect to the operation of the Hospital by Purchaser and the Hospital on and following the Closing Date.

11.2     Indemnification by Seller. Seller shall defend, indemnify and hold harmless Purchaser and its affiliates, and its and their respective officers, employees, agents, or independent contractors (collectively, "Purchaser Indemnified Parties"), from and against any and all losses, liabilities, damages, costs (including, without limitation, court costs and costs of appeal) and expenses (including, without limitation, reasonable attorneys' fees and fees of expert consultants and witnesses) that such Purchaser Indemnified Party incurs as a result of, or with respect to (i) any misrepresentation or breach of warranty by Seller under this Agreement, (ii) any breach of Seller, or any failure by Seller to perform, any covenant or agreement of, or required to be performed by, Seller under this Agreement, (iii) any of the Liabilities for the period up to and including the Closing Date, or (iv) any claim made by a third party with respect to the operation of the Hospital by Seller prior to the Closing Date.

## ARTICLE XII

## MISCELLANEOUS

12.1     Expenses. Except as otherwise provided in this Agreement, each of Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

12.2     Injunctive Relief. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.

12.3     Waiver of Right to Trial by Jury. Each Party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

12.4     Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto) and the Confidentiality Agreement represent the entire understanding and agreement

4875-7375-0681 v.4

JELLICO 0023

between the Parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

12.5    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee applicable to contracts made and performed in such State.

12.6    Notices. All notices and other communications under this Agreement shall be in writing via electronic mail ("email") or hard copy and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Seller, to:        Jellico Regional Hospital, LLC
                         10996 Four Seasons Pl 100C
                         Crown Point, IN 46307
                         c/o Kirnjot Singh, MD
                         President
                         ksingh@boavidahealthcare.com

If to Purchaser, to:     Progressive Health Group, LLC
                         628 N 14th Street
                         Oxford, MS 38655
                         c/o Quentin Whitwell
                         CEO
                         quentinwhitwell@icloud.com

12.7    Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Contemplated Transactions is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Contemplated Transactions are consummated as originally contemplated to the greatest extent possible.

12.8    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement

Page **17** of **24**

except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other Party hereto and any attempted assignment without the required consents shall be void; provided, however, that Purchaser may assign its right to acquire any or all of the Purchased Assets and its other rights hereunder to an entity wholly owned by it that also assumes all of Purchaser's obligations hereunder (but such assumption shall not relieve Purchaser of its obligations hereunder), with the consent of Seller, which shall not be unreasonably withheld. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the Parties hereto of any of their obligations. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

12.9    No Personal Liability.  In entering into this Agreement and except as outlined herein, the Parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any Party hereto shall be personally liable or responsible to any other Party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any Party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named Parties only (but nothing contained herein shall limit the liability of any person for his or her fraudulent acts).

12.10    Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

4875-7375-0681 v.4

JELLICO 0025

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

PURCHASER:                                  SELLER:

Progressive Health Group, LLC              Jellico Regional Hospital, LLC

By: _____              By: _____

Name: QUENTIN WHITWELL                      Name: Kirnjot Singh, MD

Its: CEO                                     Its: President

4875-7375-0681 v.4

JELLICO 0026

## Exhibit A

## Assumed Contracts

| Vendor Name | Vendor# | Phone | Balance |
|---|---|---|---|
| Monthly/Aging Totals | | | |
| 3 AM TECHNOLOGIES LLC | 00024 | 202-020-2020 | 24,919.21 |
| AFCO | 00033 | 202-020-2020 | 18,933.74 |
| AMAZON | 00131 | 202-020-2020 | 1,433.75 |
| AMERICAN ESOTERIC LABORATORIES | 00220 | 202-020-2020 | 5,639.95 |
| APPALACHIA HEALTH SERVICES | 00256 | 423-494-2543 | 30,000.00 |
| ASPYRA LLC | 00162 | 202-020-2020 | 2,613.00 |
| BAPTIST HEALTH-CORBIN | 00194 | 866-273-5392 | 1,802.52 |
| BAXTER HEALTHCARE CORPORATION | 00064 | 202-020-2020 | 6,381.28 |
| BUILDING SYSTEMS TECHNOLOGY | 00061 | 202-020-2020 | 4,094.98 |
| CARDINAL HEALTH 110 LLC | 00010 | 202-020-2020 | 9,604.58 |
| CERTIFIED GENERATOR SERVICE | 00017 | 865-523-4510 | 1,274.80 |
| CIHQ LLC | 00174 | 866-324-5080 | 2,703.49 |
| CPSI | 00044 | 202-020-2020 | 33,650.02 |
| CROTHALL HEALTHCARE | 00074 | 800-447-4476 | 17,929.12 |
| DAIKIN APPLIED | 1001 | 202-020-2020 | 10,304.52 |
| DATALYST LLC | 00035 | 202-020-2020 | 121.22 |
| DELUXE CORPORATION | 00073 | 800-328-0304 | 5.95 |
| DEX IMAGING | 00027 | 800-995-4468 | 93.29 |
| DNV HEALTHCARE USA INC | 00150 | 202-020-2020 | 10,193.94 |
| ECOLAB INC | 00106 | 202-020-2020 | 1,730.40 |
| ELIJAH CLINE MD | 00062 | 202-020-2020 | 1,875.00 |
| ELLISON SANITARY SUPPLY | 00138 | 423-562-3312 | 1,542.65 |
| FEDEX | 00218 | 202-020-2020 | 71.87 |
| FESCO | 00262 | 865-522-5764 | 786.49 |
| GRAINGER | 00058 | 202-020-2020 | 1,140.75 |
| HEALTH CARE LOGISTICS INC | 00034 | 800-848-1633 | 855.44 |
| HEALTHCARE APPRAISERS INC | 00202 | 202-020-2020 | 7,383.49 |
| HERC | 00021 | 800-259-5940 | 43,600.00 |
| HOLSTON GASES | 00015 | 606-549-0424 | 5,341.15 |
| IMAGE MATTERS INC | 00037 | 202-020-2020 | 940.97 |
| INNOVATIVE PATHOLOGY SERVICES | 00032 | 202-020-2020 | 1,500.00 |
| IRONSIDE HUMAN RESOURCES | 00288 | 202-020-2020 | 0.00 |
| JAYS COMPANY | 00076 | 763-557-0056 | 195.90 |
| JELLICO CITY RECORDER | 00230 | 423-784-6351 | 877.00 |
| JOHNSON CONTROLS FIRE | 00005 | 865-675-9945 | 11,130.45 |
| LABNET LLC | 00012 | 202-020-2020 | 29,273.34 |
| MANA MEDICAL STAFFING | 00007 | 423-667-8754 | 64,222.00 |
| MCKESSON MEDICAL-SURGICAL INC | 00016 | 202-020-2020 | 1,572.61 |
| MEDICAL WASTE OF AMERICA | 00053 | 865-558-3103 | 1,371.64 |
| MEDLINE INDUSTRIES LP | 00001 | 800-388-2147 | 16,458.47 |
| METRO COMMUNICATIONS LLC | 00278 | 202-020-2020 | 660.00 |
| NELSON MULLINS RILEY & SCARBOR | 00190 | 202-020-2020 | 7,448.00 |
| NORTEK MEDICAL STAFFING INC | 00022 | 202-020-2020 | 9,247.82 |
| ORKIN | 00048 | 202-020-2020 | 851.96 |
| OTIS ELEVATOR COMPANY | 00075 | 865-525-0282 | 6,407.30 |
| OUTCOMES OPERATING INC | 00214 | 800-698-8809 | 1,962.00 |
| PHARMACY FIRST | 00254 | 202-020-2020 | 316.00 |
| PREFFERED HEALTHCARE INC | 00294 | 202-020-2020 | 0.00 |
| SHIFTKEY LLC | 00284 | 202-020-2020 | 0.00 |
| SMITH HARDWARE | 00136 | 423-562-7738 | 102.93 |
| SPBS INC | 00028 | 202-020-2020 | 6,861.29 |
| SPECTRUM | 00085 | 202-020-2020 | 584.66 |
| SYCAMORE PHYSICIANS LLC | 00292 | 202-020-2020 | 0.00 |
| SYSMEX AMERICA INC | 00026 | 888-879-7639 | 6,755.43 |
| THE MEDICUS FIRM INC | 00270 | 888-260-4242 | 16,500.00 |
| TRI-TECH MEDICAL INC. | 00063 | 901-752-8740 | 4,200.00 |
| TRS MANAGED SERVICES | 00286 | 202-020-2020 | 0.00 |
| US FOODS INC | 00003 | 704-598-9797 | 818.89 |
| VWR INTERNATIONAL LLC | 00208 | 202-020-2020 | 11,761.69 |
| WESTERN HEALTHCARE LLC | 00290 | 202-020-2020 | 0.00 |
| XEROX FINANCIAL SERVICES LLC | 00038 | 202-020-2020 | 1,747.26 |
| Monthly Grand Totals | | | Balance |
| Monthly Grand Totals: | | | 449,993.61 |

Page **20** of **24**

JELLICO 0027

<u>**Exhibit B**</u>

**Bill of Sale**

4875-7375-0681 v.4

JELLICO 0028

**Exhibit C**

**Billing and Collections Services Agreement**

4875-7375-0681 v.4

JELLICO 0029

### Schedule 4.16

1. DNV surveyed Jellico Regional Hospital ("JRH") twice in 2023. The first time JRH received a denial letter which was appealed and also denied. A plan of correction was submitted, and a resurvey was scheduled. A second survey was conducted and JRH was denied as well. Subsequently, JRH chose to accredit with CIHQ and was successful for CAH, acute and swing bed services.
2. The Tennessee Health Facilities Commission surveyed JRH on several days in late November 2023 and December 2023 in response to complaints received from the public. They issued deficiencies ("Immediate Jeopardy") at the state and federal level which have been disclosed to Buyer. The revised Allegation of Compliance ("AOC") (the initial AOC was rejected on December 21, 2023) and Plan of Correction are in process as of December 22 2023. All documents received regarding these actions have been provided to Buyer.
3. JRH does not have a contract with Tricare/Champus and never has had one.

Page **23** of **24**

JELLICO 0030

### Schedule 4.17

1. The Tennessee Health Facilities Commission surveyed JRH for an active license in January 2023 and issued deficiencies. These deficiencies were corrected via a plan of correction. On follow-up survey JRH was found in compliance.
2. The TN Health Facilities Commission, a new department created in 2022 incorporating the TN Health Facilities Licensing Division, issued JRH a Critical Access Hospital license in 2021 and 2022. This was erroneously changed to an Acute Care/Pediatric Hospital license in April 2023. JRH has been working with counsel and the Commission to correct this error. All licenses have been disclosed to Buyer.

Page **24** of **24**

## SUBLEASE AGREEMENT

THIS SUBLEASE AGREEMENT (this "Agreement"), entered into as of the 29th day of January, 2024 (the "Effective Date"), is by and between Jellico Regional Hospital, LLC ("Sublessor") and Progressive Health of Jellico, LLC ("Sublessee") (the Sublessor and Sublessee, together, the "Parties", or each, a "Party").

### WITNESSETH:

WHEREAS, pursuant to that certain Lease Agreement, dated April 21, 2021, by and between Sublessor and the City of Jellico, Tennessee ("Lessor"), and attached hereto as Exhibit A (the "Lease"), Lessor is currently leasing to Sublessor, as lessee, the Premises as defined in the Lease (the "Premise");

WHEREAS, Sublessor and Progressive Health Group, LLC ("PHG") have entered into that certain Asset Purchase Agreement, dated as of December 22, 2023 (the "APA"), pursuant to which PHG will purchase substantially all of the assets of Sublessor used or held for use, *inter alia*, in the operation of the medical services located at the Premises;

WHEREAS, PHG has assigned its interest in the APA to Sublessee, and Sublessor has accepted such assignment; and

WHEREAS, Sublessee desires to sublease the Premises for Sublessor's use on the terms and conditions set forth below for the period of time beginning on the Effective Date and ending on the Termination Date as noted in the Lease (Article II).

NOW THEREFORE, in consideration of the mutual covenants set forth herein, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Sublease of Premises**.  Sublessor hereby subleases to Sublessee, and Sublessee hereby subleases from Sublessor, the Premises (the "Sublease").

2. **Term**.  The term of the Sublease shall commence on the Effective Date and shall terminate on the Termination Date as noted in the Lease (Article II) (the "Sublease Term").

3. **Obligation Under Lease**.  Sublessee hereby assumes all of the responsibilities and obligations to be performed on the part of Sublessor as lessee under the Lease with respect to the Premises arising or accrued during the Sublease Term on and after the Effective Date, other than any obligations resulting from any breach or default under the Lease, or destruction of or damage to the Premises, by Sublessor prior to the Effective Date.  All obligations for rent, utilities, taxes and other expenses shall be prorated as of the Effective Date.

| EXHIBIT |
| 2 |

4. **Termination**.  In the event the Lease is terminated pursuant to its terms prior to the expiration of the Term of this Sublease, this Sublease shall automatically cease and terminate as of the date upon which the Lease is terminated.  Upon any such termination of the Lease, all rent due hereunder shall be prorated from the last day of the month of termination, and neither Party shall have any further obligation or liability to the other arising out of the Sublease, except for rights or obligations that had accrued prior to the effective date of the termination of this Sublease.  The termination of the Lease shall not affect any rights, duties, responsibilities or obligations of the Parties under the APA.

5. **Nature of Sublease**.  The Parties understand and agree that this Sublease is not an assignment of all of Sublessor's rights under the Lease. Therefore, if Sublessee ceases to provide medical services at the Premises during the Term of this Agreement, this Agreement shall automatically terminate with Sublessor reacquiring all rights and privileges as set for in the Lease.  Therefore, as between Sublessor and Sublessee this Agreement shall not be treated as an assignment.

6. **APA Conditions Precedent to Obligations of Purchaser**.  By Sublessor and Sublessee entering into this Sublease, the Parties understand and agree that the requirements of Section 8.1(d) of the APA is hereby modified as follows:

    (d) Hospital Lease.  Seller and Purchaser shall enter into a sublease agreement whereby Purchaser has the rights and obligations under the Hospital Lease for use of the Hospital.

    No further action is required under Section 8.1 of the APA after the execution of this Agreement by the Parties.

7. **Indemnification by Sublessee**.  Sublessee shall defend, indemnify and hold harmless Sublessor and its affiliates, and its and their respective officers, employees, agents, or independent contractors (collectively, "Sublessor Indemnified Parties"), from and against any and all losses, liabilities, damages, costs (including, without limitation, court costs and costs of appeal) and expenses (including, without limitation, reasonable attorneys' fees and fees of expert consultants and witnesses) that such Sublessor Indemnified Party incurs as a result of, or with respect to i) entering into this Agreement brought by any party including the Lessor, or ii) Sublessee's use of the Premises and fulfillment of the duties and responsibilities under the Lease while Sublessee is providing medical services at the Premises pursuant to the terms and conditions of this Sublease and the fulfillment of the obligations under the Lease.

8. **Negotiating New Lease Agreement with Lessor**.  Sublessee hereby agrees to use reasonable efforts immediately after entering into this Agreement to negotiate with the Lessor for a new Lease Agreement directly between Sublessee and Lessor.  To the extent reasonably requested and necessary, Sublessor shall cooperate with Sublessee during such negotiations between Sublessee and Lessor.

JELLICO 0002

9. **Amendment**. This Agreement may not be amended, modified or terminated except by an instrument, in writing, executed by the Parties hereto.

10. **Counterparts**. This Agreement may be executed in several counterparts, and all so executed shall constitute one Agreement, binding on each of the Parties hereto, notwithstanding that each of the Parties are not signatories to the original or the same counterpart. Delivery of an executed counterpart of this Agreement by facsimile, electronic mail, or other electronic imaging means shall be deemed to have been duly and validly delivered and effective as an original for all purposes.

11. **Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns.

12. **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the state of Tennessee.

13. **Asset Purchase Agreement**. By executing this Agreement, the Parties hereby agree that Sublessee shall be the substituted party to the APA, replacing PHG.

*[Signatures on Following Page]*

**IN WITNESS WHEREOF,** Sublessor and Sublessee have executed this Sublease Agreement, to be effective as of the day and year first above written.

**SUBLESSOR**

**Jellico Regional Hospital, LLC**

By: _____

Name: Kirnjot Singh, MD

Its:    President


**SUBLESSEE**

**Progressive Health of Jellico, LLC**

By: _____

Name: Quentin Whitwell

Its:    CEO

4890-9649-2192 v.3

JELLICO 0004

## EXHIBIT A

**Lease**

JELLICO 0005

## PROGRESSIVE HEALTH GROUP, LLC
## BRING DOWN CERTIFICATE

### January 29, 2024

This Bring Down Certificate is furnished in connection with the closing of the transactions contemplated by the Asset Purchase Agreement, dated December 22, 2023, by and among Jellico Regional Hospital, LLC, a Texas limited liability company ("Seller") and Progressive Health of Jellico, LLC, a Tennessee limited liability company ("Buyer") (the "Purchase Agreement").

Buyer hereby certifies that each covenant and agreement of Buyer to be performed prior to or as of the Closing pursuant to the Purchase Agreement has been performed, and each representation and warranty of Buyer made in Article V of the Purchase Agreement is true and correct on the Closing Date, as if and as made on and as of the Closing.

Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Purchase Agreement.

**IN WITNESS WHEREOF**, Buyer has executed this Bring Down Certificate to be effective as of the Closing.

**BUYER:**

**PROGRESSIVE HEALTH OF JELLICO, LLC**

*Quentin Whitwell*
By: Quentin Whitwell (Jan 29, 2024 11:01 CST)
        Robert Quentin Whitwell, Manager

EXHIBIT
3

## JOINT WRITTEN CONSENT OF THE MEMBER AND MANAGER OF
## PROGRESSIVE HEALTH OF JELLICO, LLC

### Effective as of:  January 29, 2024

The undersigned, being the Sole Member and Manager of Progressive Health of Jellico, LLC, a Tennessee limited liability company ("Company"), hereby takes the following actions and adopts the following resolutions in lieu of a meeting:

**WHEREAS**, the Company is a party to that certain Asset Purchase Agreement, dated December 22, 2023, by and between Jellico Regional Hospital, LLC, a Texas limited liability company ("Seller") and the Company, as the "Buyer" (the "MIPA"); and

**WHEREAS**, the Manager and Member believe that it is advisable and in the best interests of the Company to enter into the MIPA and to consummate the transactions contemplated thereby (the "Transaction")

**NOW THEREFORE, BE IT RESOLVED**, that the Manager and Member hereby approve and adopt the MIPA and such terms of the Transaction;

**FURTHER RESOLVED**, that the Member of the Company hereby directs the Manager to cause the Company to effectuate the Transaction on the terms and conditions set out in the MIPA;

**FURTHER RESOLVED**, that all prior actions taken by the Manager and Member of the Company that would have been authorized by these resolutions if taken after their adoption are hereby approved, ratified and confirmed; and

**FURTHER RESOLVED**, that Robert Quentin Whitwell, as Manager, be, and hereby is, authorized and directed to execute and deliver all such documents, with such modifications as he may reasonably deem appropriate, and to take or omit to take all such actions as he may reasonably deem to be necessary or appropriate to effectuate the Transaction and to effect the intent of these resolutions, the modification, execution, and delivery thereof or the taking or not taking of any actions being conclusive evidence of his determination that such action or inaction is necessary or appropriate.

_____

The Secretary of the Company is hereby directed to place this written consent in the appropriate order in the Minute Book of the Company. This consent may be executed in one or more counterparts with the same effect as if the signatories executing the several counterparts had executed a single document, and all such executed counterparts shall together constitute one and the same instrument.  Signatures submitted by facsimile or other electronic means shall be accepted as originals in the absence of a valid reason to doubt their authenticity. The original of this document, including any and all signature page(s), may be scanned and stored in a computer database or other electronic format and the original(s) destroyed, and any printout or other output readable by human sight, the reproduction of which accurately reproduces the original of this document, may be used for any purpose as if it were the original, including proof of the content of the original writing.

*Signature Page to Joint Written Consent of the Member and Manager of*
*Progressive Health of Jellico, LLC*

　　　　IN WITNESS WHEREOF, the undersigned, to evidence his consent to taking the foregoing actions by written instrument in lieu of a meeting and his vote FOR the foregoing resolutions, has set his hand and indicated his vote as of the day and year first set out above.

**MANAGER AND MEMBER:**

*Quentin Whitwell*
Quentin Whitwell (Jan 29, 2024 11:01 CST)
_____
**Robert Quentin Whitwell**

2